# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| DEBORAH VANCE, as the surviving mother of Solomon Lake, TONI BARRETT, individually and K.D., a minor by and through his mother and guardian ad litem TONI BARRETT.<br><br>    Plaintiffs,<br><br>v.<br><br>ZOLL MEDICAL CORPORATION, ZOLL MANUFACTURING CORPORATION, ZOLL LIFECOR CORPORATION, ZOLL LIFEVEST HOLDINGS, LLC, and ZOLL SERVICES, LLC,<br><br>    Defendants. | Case No.:<br><br>---<br><br>**COMPLAINT FOR DAMAGES** |

Plaintiffs DEBORAH VANCE, as the surviving mother of Solomon Lake, DEBORAH VANCE, individually, TONI BARRETT, individually as the surviving significant other by common law marriage, and K.D. , a minor and dependent of decedent Solomon Lake through their undersigned counsel and pursuant to Federal Rule of Civil Procedure 15(a)(2), hereby files their Complaint for Damages against Defendants ZOLL MEDICAL CORPORATION, ZOLL MANUFACTURING CORPORATION, ZOLL LIFECOR CORPORATION, ZOLL LIFEVEST HOLDINGS, LLC, and ZOLL SERVICES, LLC for the claims stated herein. In support thereof, Plaintiffs state:

1

**COMPLAINT FOR DAMAGES**

## I.    SUMMARY OF THE ACTION

1.    Plaintiffs bring this civil action pursuant to California Code of Civil Procedure§§ 377.60 et sec and the California Products Liability Act as outlined in California Civil Code §§ 1714.45 to recover for the injuries and wrongful death caused to Solomon Lake by a defective, unsafe, and unreasonably dangerous ZOLL LifeVest wearable defibrillator (hereinafter "Subject LifeVest"), which claims pass by right of survivorship to Solomon Lake's mother, DEBORAH VANCE, TONI BARRETT, individually as the surviving significant other by common law marriage, and K.D. , a minor and dependent of decedent Solomon Lake.

2.    Specifically, the Subject LifeVest suffered from a manufacturing defect that caused the Subject LifeVest to fail to deliver life-saving defibrillation treatment to Solomon Lake when he needed it.

3.    Plaintiffs sue each of the Defendants for their respective roles in defectively manufacturing, refurbishing, repairing, servicing, producing, assembling, and distributing the Subject LifeVest.

## II.    THE PARTIES, JURISDICTION & VENUE

4.    Plaintiff DEBORAH VANCE (hereinafter "Plaintiff") is a Arizona citizen, resident, and domiciliary.

5.    Plaintiff TONI BARRETT (hereinafter "Plaintiff") is a California citizen, resident, and domiciliary.

2

**COMPLAINT FOR DAMAGES**

6.     Plaintiff K.D.  (hereinafter "Plaintiff") is a California citizen, resident, and domiciliary.

7.     Plaintiff DEBORAH VANCE is the mother of decedent Solomon Lake (hereinafter "Mr. Lake").

8.     Plaintiff TONI BARRETT is the fiancé of decedent Mr. Lake.

9.     Plaintiff K.D.  is a minor and was a dependent of decedent Mr. Lake

10.    Defendant ZOLL MEDICAL CORPORATION is a Massachusetts corporation with its principal place of business located in Massachusetts.

11.    Defendant ZOLL MANUFACTURING CORPORATION is a Nevada corporation with its principal place of business located in Pennsylvania.

12.    Defendant ZOLL LIFECOR CORPORATION is a Delaware corporation with its principal place of business located in Pennsylvania.

13.    Defendant ZOLL LIFEVEST HOLDINGS, LLC is a Nevada limited-liability company. The sole member of Defendant ZOLL LIFEVEST HOLDINGS, LLC is Jason T. Whitin, who is a Pennsylvania citizen, resident, and domiciliary.

14.    Defendant ZOLL SERVICES, LLC is a Nevada limited liability company. The sole member of Defendant ZOLL SERVICES, LLC is Sean M. Rollman, who is a Pennsylvania citizen, resident, and domiciliary.

15.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs: DEBORAH VANCE; TONI BARRETT; and K.D.  are citizens

**COMPLAINT FOR DAMAGES**

of a state of which no Defendant is a citizen and the amount of controversy exceeds $75,000.00 (Seventy-Five Thousand Dollars and Zero Cents).

16.     This Court is authorized to exercise personal jurisdiction over Defendant ZOLL MEDICAL CORPORATION pursuant to California Code of Civil Procedure (CCP) § 410.10 for at least the following reasons:

a. On November 16, 2022, Decedent Solomon Lake was discharged from Antelope Valley Hospital located at 1600 W Ave J, Lancaster, CA 93534 with a LifeVest to address and protect against congestive heart failure.

b. Defendant ZOLL MEDICAL CORPORATION transacts business in California and Plaintiffs' claims for relief against Defendant ZOLL MEDICAL CORPORATION arise out of Defendant ZOLL MEDICAL CORPORATION's transaction of business in California.

c. Defendant ZOLL MEDICAL CORPORATION contracts to supply services or things in California and Plaintiffs' claims for relief against Defendant ZOLL MEDICAL CORPORATION's supply of services or things in California.

d. Defendant ZOLL MEDICAL CORPORATION caused tortious injury to Plaintiffs through Defendant ZOLL MEDICAL CORPORATION's acts or omissions in the state of California, specifically at Antelope

4

**COMPLAINT FOR DAMAGES**

Valley Hospital in Palmdale, CA where decedent SOLOMON LAKE

was issued the defective life vest manufactured by Defendants.

17.    The Court is additionally authorized to exercise personal jurisdiction

over Defendant ZOLL MEDICAL COPORATION because Defendant ZOLL

MEDICAL CORPORATION enjoys numerous, continuous, pervasive, and

systematic contacts with California and Plaintiffs' claims for relief against

Defendant ZOLL MEDICAL CORPORATION arise out of Defendant ZOLL

MEDICAL CORPORATION's contacts with California.

18.    This Court's exercise of personal jurisdiction over Defendant ZOLL

MEDICAL CORPORATION comports with the due process requirements embodied

within the United States Constitution and the Constitution of the State of California.

19.    The Court is authorized to exercise personal jurisdiction over

Defendant ZOLL MANUFACTURING CORPORATION pursuant to California

Code of Civil Procedure (CCP) § 410.10 for at least the following reasons:

   a. Defendant ZOLL MANUFACTURING CORPORATION transacts

      business in California and Plaintiffs' claims for relief against Defendant

      ZOLL MANUFACTURING CORPORATION arise out of Defendant

      ZOLL MANUFACTURING CORPORATION's transaction of

      business in California.

5
**COMPLAINT FOR DAMAGES**

b. Defendant ZOLL MANUFACTURING CORPORATION contracts to supply services or things in California and Plaintiffs' claims for relief against Defendant ZOLL MANUFACTURING CORPORATION arise out of Defendant ZOLL MANUFACTURING CORPORATION's supply of services or things in California.

c. Defendant ZOLL MANUFACTURING CORPORATION caused tortious injury to Plaintiffs through Defendant ZOLL MANUFACTURING CORPORATION's acts or omissions in California where the defective life vest was issued, ultimately resulting in Mr. Lake's death in Austin, Texas.

20. The Court is additionally authorized to exercise personal jurisdiction over Defendant ZOLL MANUFACTURING CORPORATION because Defendant ZOLL MANUFACTURING CORPORATION enjoys numerous, continuous, pervasive, and systematic contacts with California and Plaintiff's claims for relief against Defendant ZOLL MANUFACTURING CORPORATION arise out of Defendant ZOLL MANUFACTURING CORPORATION's contacts with California.

21. This Court's exercise of personal jurisdiction over Defendant ZOLL MANUFACTURING CORPORATION comports with the due process

**COMPLAINT FOR DAMAGES**

requirements embodied within the United States Constitution and the Constitution of the State of California.

22.    This Court is authorized to exercise personal jurisdiction over Defendant ZOLL LIFECOR CORPORATION pursuant to California Code of Civil Procedure (CCP) § 410.10 for at least the following reasons:

    a.    Defendant ZOLL LIFECOR CORPORATION transacts business in California and Plaintiffs' claims for relief against Defendant ZOLL LIFECOR CORPORATION arise out of Defendant ZOLL LIFECOR CORPORATION's transaction of business in California.

    b.    Defendant ZOLL LIFECOR CORPORATION contracts to supply services or things in California and Plaintiffs' claims for relief against Defendant ZOLL LIFECOR CORPORATION arise out of Defendant ZOLL LIFECOR CORPORATION's supply of services or things in California.

    c.    Defendant ZOLL LIFECOR CORPORATION caused tortious injury to Plaintiffs through Defendant ZOLL LIFECOR CORPORATION's acts or omissions in California.

23.    The Court is additionally authorized to exercise personal jurisdiction over Defendant ZOLL LIFECOR CORPORATION because Defendant ZOLL LIFECOR CORPORATION enjoys numerous, continuous, pervasive, and

**COMPLAINT FOR DAMAGES**

systematic contacts with California and Plaintiffs' claims for relief against Defendant ZOLL LIFECOR CORPORATION arise out of Defendant ZOLL LIFECOR CORPORATION's contacts with California.

24.    This Court's exercise of personal jurisdiction over Defendant ZOLL LIFECOR CORPORATION comports with the due process requirements embodied within the United States Constitution and the Constitution of the State of California.

25.    This Court is authorized to exercise personal jurisdiction over Defendant ZOLL LIFEVEST HOLDINGS, LLC pursuant to California Code of Civil Procedure (CCP) § 410.10 at least the following reasons:

a.    Defendant ZOLL LIFEVEST HOLDINGS, LLC transacts business in California and Plaintiffs' claims for relief against Defendant ZOLL LIFEVEST HOLDINGS, LLC arise out of Defendant ZOLL LIFEVEST HOLDINGS, LLC's transaction of business in California.

b.    Defendant ZOLL LIFEVEST HOLDINGS, LLC contracts to supply services or things in California and Plaintiffs' claims for relief against Defendant ZOLL LIFEVEST HOLDINGS, LLC's supply of services or things in California.

c.    Defendant ZOLL LIFEVEST HOLDINGS, LLC caused tortious injury to Plaintiffs through Defendant ZOLL LIFEVEST HOLDINGS, LLC's acts or omissions in California.

**COMPLAINT FOR DAMAGES**

26.    The Court is additionally authorized to exercise personal jurisdiction over Defendant ZOLL LIFEVEST HOLDINGS, LLC because Defendant ZOLL LIFEVEST HOLDINGS, LLC enjoys numerous, continuous, pervasive, and systematic contacts with California and Plaintiffs' claims for relief against Defendant ZOLL LIFEVEST HOLDINGS, LLC arise out of Defendant ZOLL LIFEVEST HOLDINGS, LLC's contacts with California.

27.    This Court's exercise of personal jurisdiction over Defendant ZOLL LIFEVEST HOLDINGS, LLC comports with the due process requirements embodied within the United States Constitution and the Constitution of the State of California.

28.    This Court is authorized to exercise personal jurisdiction over Defendant ZOLL SERVICES, LLC pursuant to California Code of Civil Procedure (CCP) § 410.10 for at least the following reasons:

    a.    Defendant ZOLL SERVICES, LLC transacts business in California and Plaintiffs' claims for relief against Defendant ZOLL SERVICES, LLC arise out of Defendant ZOLL SERVICES, LLC's transaction of business in California.

    b.    Defendant ZOLL SERVICES, LLC contracts to supply services or things in California and Plaintiffs' claims for relief against Defendant

**COMPLAINT FOR DAMAGES**

ZOLL SERVICES, LLC arise out of Defendant ZOLL SERVICES, LLC's supply of services or things in California.

c. Defendant ZOLL SERVICES, LLC caused tortious injury to Plaintiffs through Defendant ZOLL SERVICES, LLC's acts or omissions in California.

29.    The Court is additionally authorized to exercise personal jurisdiction over Defendant ZOLL SERVICES, LLC because Defendant ZOLL SERVICES, LLC enjoys numerous, continuous, pervasive, and systematic contacts with California and Plaintiffs' claims for relief against Defendant ZOLL SERVICES, LLC arise out of Defendant ZOLL SERVICES, LLC's contacts with California.

30.    This Court's exercise of personal jurisdiction over Defendant ZOLL SERVICES, LLC comports with the due process requirements embodied within the United States Constitution and the Constitution of the State of California.

31.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(d) because a substantial part of the events or omissions giving rise to the claims stated herein occurred within the Central District of California.

### III.    FACTUAL ALLEGATIONS

### 1. Background of ZOLL and the LifeVest

32.    Defendants    ZOLL    MEDICAL    CORPORATION,    ZOLL MANUFACTURING CORPORATION, ZOLL LIFECOR CORPORATION, ZOLL

10

**COMPLAINT FOR DAMAGES**

LIFEVEST HOLDINGS, LLC and ZOLL SERVICES, LLC (collectively "ZOLL") are in the business of designing, manufacturing, assembling, marketing, supplying, distributing, refurbishing, repairing, maintaining, and servicing a wide range of medical devices, including wearable cardiac defibrillators like the LifeVest.

33.    The LifeVest is a wearable cardiac defibrillator that is worn by patients at risk for sudden cardiac arrest. The LifeVest is intended to provide immediate protection to patients during their changing heart condition and while permanent cardiac arrest risks have not been ascertained by the patient's medical team. The LifeVest therefore allows a patient's physicians time to assess the patient's long-term cardiac risks and to make appropriate diagnostic and therapeutic plans.

34.    The LifeVest is designed to continuously monitor the patient's heart and to deliver treatment shocks to the patient when an abnormal heart rhythm (arrhythmia) is detected.

35.    The LifeVest accomplishes its design intention through two main component systems: a garment and a monitor. The LifeVest's garment is worn underneath the patient's clothing and the monitor is worn around the patient's wrist or from a shoulder strap.

36.    The LifeVest's garment houses four circular electrocardiogram sensors spaced around the torso and three rectangular therapy electrodes that are located two on the back and one below the left breast. The electrocardiogram sensors measure

**COMPLAINT FOR DAMAGES**

the electrical signals from the patient's heart while the therapy electrodes deliver electrical shock treatments to the patient when an arrhythmia is detected.

37.     The four electrocardiogram sensors and three therapy electrodes are connected by a series of wires and cables to a central distribution node. A cable from the distribution node connects these sensors and electrodes to the LifeVest's monitor.

38.     The LifeVest's monitor houses the LifeVest's computer and power supply systems. Through proprietary software and algorithms, the monitor's computer system receives and interprets the electrical signals measured by the LifeVest's electrocardiogram sensors. Upon detecting an arrhythmia, the computer system commences a treatment sequence that, if needed, will deliver an electrical shock to the patient through the LifeVest's therapy electrodes to correct the arrhythmia.

39.     Prior to delivering an electrical shock to the patient, the LifeVest is designed to sound an alarm to verify that the patient is nonresponsive. If the patient is conscious, the patient has time to respond to the alarm by pressing two buttons on the monitor to stop the treatment sequence. If the patient does not respond, the LifeVest warns bystanders that an electrical shock is about to be administered to the patient and to stand clear. If the patient's arrhythmia continues without the patient responding, the LifeVest will deliver an electrical shock to the patient through the therapy electrodes.

**COMPLAINT FOR DAMAGES**

40.     After an electrical shock is administered, if the patient's heartbeat returns to normal, the alarm stops and the LifeVest returns to its normal monitoring mode. However, if the patient's heartbeat does not return to normal, the LifeVest is designed to repeat the treatment sequence. The LifeVest can be programmed to repeat the treatment sequence up to five times, delivering up to five separate electrical shocks to the patient in an attempt to correct the arrhythmia.

41.     The LifeVest is powered by a rechargeable battery pack that is inserted into the monitor. The battery pack consists of a sealed plastic case containing rechargeable lithium-ion batteries. The battery pack can supply power to the LifeVest for only a certain amount of time and must be removed and recharged using a separate, stand-alone charger provided with the LifeVest.

42.     The LifeVest is not designed to be a patient's permanent treatment modality, but is intended to temporarily protect at-risk patients while the patient's underlying heart condition stabilizes, or the patient's healthcare team decides on an appropriate long-term diagnostic of therapeutic plan. As a result, the LifeVest is returned to ZOLL after a patient no longer needs the device, or transitions to a different treatment modality.

43.     When the LifeVest is returned to ZOLL, ZOLL is required to test, inspect, repair, refurbish, and service the LifeVest and its components. During this process, ZOLL is required to ensure that all component parts are functioning

**COMPLAINT FOR DAMAGES**

properly and ZOLL must replace, or repair, all damaged, expired, or nonconforming components. ZOLL must additionally test the LifeVest's monitor and battery pack to make sure that the LifeVest will operate when needed.

44.    After the LifeVest satisfies all testing, inspection, and quality assurance requirements, the device is distributed to a new patient.

## 2. Federal Regulation of the LifeVest

45.    The LifeVest is classified by the United States Food and Drug Administration (hereinafter "FDA") as a Class III medical device. Class III medical devices are devices that are "purported or represented to be for use in supporting or sustaining human life" or which "present[] a potential unreasonable risk of illness or injury" 21 U.S.C. § 360c(a)(1)(C)(ii).

46.    Class III medical devices like the LifeVest are subject to the FDA's premarket approval process and are otherwise heavily regulated under federal law. The purpose of this premarket approval process, and heavy federal regulation, is to ensure the safety and effectiveness of medical devices that can cause serious injury or death to consumers if not prepared for manufactured properly.

47.    On December 18, 2001, the FDA entered an order granting premarket approval under the Food, Drug, and Cosmetic Act for the first iteration of the LifeVest. Through a series of supplements, the FDA has granted premarket approval for all subsequent iterations of the LifeVest as well. The FDA's grant of premarket

**COMPLAINT FOR DAMAGES**

approval allows ZOLL to manufacture the LifeVest for commercial sale and distribution.

48.    By receiving premarket approval for the LifeVest, ZOLL is required by federal law to manufacture, produce, and distribute every LifeVest pursuant to the design specifications and requirements approved by the FDA during the premarket approval process and subsequent supplementations. These design specifications and requirements include, but are not limited to:

a.    Manufacturing, producing, refurbishing, and distributing the LifeVest with a properly functioning battery pack and battery pack charger;

b.    Manufacturing, producing, refurbishing, and distributing the LifeVest with properly functioning battery pack connections, wires, cables, and battery pack retention mechanisms;

c.    Manufacturing, producing, refurbishing, and distributing the LifeVest with properly functioning circuitry, software, and algorithms that will detect and treat cardiac arrhythmia;

d.    Manufacturing, producing, refurbishing, and distributing the LifeVest so that it is not expired and does not contain expired component parts, software, or algorithms; and

**COMPLAINT FOR DAMAGES**

e.  Properly testing, inspecting, refurbishing, repairing, servicing, and conducting quality assurance on the LifeVest before allowing the LifeVest to be used by a patient.

49.  By receiving premarket approval for the LifeVest, ZOLL is subject to additional federal regulation with respect to the production, manufacture, refurbishment, repair, and distribution of the LifeVest. This regulation includes, but is not limited to:

a.  Not introducing, delivering, or causing to be introduced or delivered into interstate commerce a LifeVest that is adulterated, or contained adulterated materials or substances;

b.  Not adulterating or causing the adulteration of a LifeVest;

c.  Not receiving or causing to be received in interstate commerce a LifeVest that is adulterated or contains adulterated materials or substances;

d.  Not manufacturing or causing to be manufactured a LifeVest that is adulterated or contains adulterated materials or substances;

e.  Not doing any act with respect to a LifeVest if such act is done while the LifeVest is held for sale after shipment in interstate commerce and results in the LifeVest being adulterated;

**COMPLAINT FOR DAMAGES**

f.  Ensuring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation, packaging, storage, installation, and service of the LifeVest and its component parts conform to current good manufacturing practices;

g.  Ensuring that the LifeVest and its component parts are produced, manufactured, and distributed in accordance with the FDA's quality system requirements;

h.  Ensuring the quality of all products and materials used to make the LifeVest and its component parts, including by ensuring the quality of the LifeVest's battery pack, battery pack connections, battery pack retention mechanisms, wires, cables, battery pack charger, circuitry, software, and algorithms;

i.  Ensuring that all products and materials used to make the LifeVest and its component parts are properly identified during all states of receipt, production, distribution, and installation so as to prevent mix-ups or the use of adulterated products or materials;

j.  Ensuring that the LifeVest devices conform to the design specifications approved by the FDA;

k.  Ensuring that the environmental conditions surrounding the production, manufacture, handling, packaging, storage, transportation, and

17
**COMPLAINT FOR DAMAGES**

distribution of the LifeVest, its component parts, and the materials used to produce the LifeVest and its component parts are adequately controlled.

l.  Ensuring that the health, cleanliness, personal practices, and clothing of personnel having contact with the LifeVest, its component parts, and the materials used to produce the LifeVest and its component parts are adequately controlled;

m.  Ensuring that the equipment and materials used to produce the LifeVest and its component parts are free from contamination and substances that could reasonably be expected to adversely affect the quality of the LifeVest or its component parts;

n.  Ensuring that all facilities used throughout the production, manufacture, and distribution of the LifeVest, its component parts, and the materials used to produce the LifeVest and its component parts are suitable to ensure the quality and orderly handling of the LifeVest, its component parts, and the materials used to produce the LifeVest and its component parts.

o.  Ensuring that all materials used to produce the LifeVest and its component parts are of sufficient quality and will not adversely affect the safety or effectiveness of the LifeVest;

18
**COMPLAINT FOR DAMAGES**

p.  Verifying through measurement, testing, and inspection that the LifeVest, its component parts, and the materials used to produce the LifeVest and its component parts conform to the design specifications approved by the FDA;

q.  Ensuring that non-conforming LifeVest devices, non-conforming component parts, and non-conforming materials are not used in the production process and are not placed into the stream of commerce;

r.  Ensuring that the LifeVest, its component parts, and the materials used to produce the LifeVest and its component parts are properly packaged and shipped so as to prevent against alteration, damage, contamination, and deterioration;

s.  Ensuring that the LifeVest, its component parts, and the materials used to produce the LifeVest and its component parts are properly handled so as to prevent mix-ups, damage, deterioration, contamination, or other adverse effects that could affect the safety and effectiveness of the LifeVest;

t.  Ensuring that the LifeVest, its component parts, and the materials used to produce the LifeVest and its component parts are properly stored so as to prevent mix-ups, damage, deterioration, contamination, use of

19
**COMPLAINT FOR DAMAGES**

obsolete, expired, or rejected items, or other adverse effects that could

affect the safety and effectiveness of the LifeVest;

u.  Ensuring that only LifeVest devices that have been approved for release

and which comply with all design specifications and federal regulations

are distributed into the stream of commerce;

v.  Recalling LifeVest devices that do not comply with design

specifications or are otherwise not safe or effective to be placed into the

stream of commerce;

w.  Ensuring that expired, deteriorated, and unfit materials and components

are not used to produce, manufacture, or distribute a LifeVest; and

x.  Ensuring that expired, deteriorated, and unfit LifeVest devices are not

distributed into the stream of commerce.

50.    The above regulations of the LifeVest, its component parts, and the

materials used to produce the LifeVest and its component parts are intended to ensure

the quality, safety, and effectiveness of LifeVest devices that reach the ultimate

consumer.

### 3.  Mr. Lake and the Subject LifeVest

51.    Mr. Lake was prescribed the Subject LifeVest to treat an underlying

heart condition that can cause arrhythmia and result in sudden cardiac arrest or death.

20
**COMPLAINT FOR DAMAGES**

52.    ZOLL is responsible for manufacturing, producing, refurbishing, repairing, assembling, testing, inspecting, and distributing the Subject LifeVest and the Subject LifeVest's component parts, including the Subject LifeVest's garment, monitor, electrocardiogram sensors, therapy electrodes, wiring, circuitry, software, algorithms, battery pack, and battery pack charger.

53.    Before Mr. Lake received the Subject LifeVest, ZOLL was in possession of the Subject LifeVest in order to refurbish, repair, and service the Subject LifeVest after being used by a prior patient. ZOLL is therefore responsible for refurbishing, repairing, and servicing the Subject LifeVest and its component parts, including the Subject LifeVest's battery pack, battery pack connections, battery pack retention mechanisms, wires, cables, battery pack charger, circuitry, software, and algorithms immediately before distributing the Subject LifeVest to Mr. Lake.

54.    On March 27, 2023, Mr. Dunkentell was wearing the Subject LifeVest, which he relied on to provide life-saving shock treatment in the event he experiences an arrhythmia.

55.    In the evening of March 27, 2023, Mr. Lake experienced an arrhythmia that required electrical shock treatment.

56.    Unfortunately, the Subject LifeVest failed to operate as designed by not administering any electrical shocks to Mr. Lake.

21
**COMPLAINT FOR DAMAGES**

57.    Further, the Subject LifeVest failed to operate as designed by not sounding an alarm upon detecting Mr. Lake's arrhythmia.

58.    Plaintiffs Toni Barrett and her son K.D.  came downstairs to find Mr. Lake already deceased lying on the ground with his eyes open.

59.    Mr. Lake ultimately perished on March 27, 2023.

60.    Plaintiffs are still in possession of the actual LifeVest which Mr. Lake died in.

61.    The Subject LifeVest's failure to detect and treatment Mr. Dunkentell's arrhythmia is the result of defects in the Subject LifeVest's manufacture, refurbishment, repair, production, assembly, and distribution in violation of the FDA's approved design specifications and requirements for the LifeVest.

62.    Specifically, the Subject LifeVest was defective and departed from the FDA's approved design specifications and requirements for the LifeVest in at least the following ways:

a. The Subject LifeVest was manufactured, produced, refurbished, and distributed with a malfunctioning battery pack, which caused the battery pack to fail to retain a charge and/or lose charge quicker than designed;

b. The Subject LifeVest was manufactured, produced, refurbished, and distributed with a malfunctioning battery pack charger, which failed to

22

**COMPLAINT FOR DAMAGES**

properly charge the Subject LifeVest's battery pack and/or caused the battery pack to lose charge quicker than designed;

c.  The Subject LifeVest was manufactured, produced, refurbished, and distributed with malfunctioning battery pack connections, battery pack retention mechanisms, wires, or cables, which caused the Subject LifeVest's battery pack to not fully connect to, or power, the Subject LifeVest.

d.  The Subject LifeVest was manufactured, produced, refurbished, and distributed with malfunctioning circuitry, software, or algorithms that failed to detect and treatment Mr. Dunkentell's arrhythmia;

e.  The Subject LifeVest was manufactured, produced, refurbished, and distributed in an expired condition, or with expired component parts, software, or algorithms that malfunctioned and failed to operate as designed on the date of the incident; and

f.  ZOLL failed to properly test, inspect, refurbish, repair, service, and conduct quality assurance on the Subject LifeVest during the refurbishment process and before distributing the Subject LifeVest to Mr. Lake.

**COMPLAINT FOR DAMAGES**

63.    By causing the Subject LifeVest to be distributed to Mr. Lake, ZOLL additionally violated several federal regulations applying to the LifeVest's manufacture, production, and distribution including, but not limited to:

a.  By introducing, delivering, or causing to be introduced or delivered into interstate commerce a LifeVest that is adulterated, or contains adulterated materials or substances;

b.  By adulterating, or causing, the adulteration of a LifeVest;

c.  By receiving, or causing to be received in interstate commerce, a LifeVest that is adulterated, or contains adulterated materials or substances;

d.  By manufacturing, or causing to be manufactured, a LifeVest that is adulterated, or contains adulterated materials or substances;

e.  By doing any act with respect to a LifeVest if such act is done while the LifeVest is held for sale after shipment in interstate commerce, and results in the LifeVest being adulterated;

f.  By failing to ensure that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation, packaging storage, installation, and service of the LifeVest and its component parts conform to current good manufacturing practices;

**COMPLAINT FOR DAMAGES**

g. By failing to ensure that the LifeVest and its component parts are produced, manufactured, and distributed in accordance with the FDA's quality system requirements;

h. By failing to ensure the quality of all products and materials used to make the LifeVest and its component parts, including by failing to ensure the quality of the LifeVest's battery pack, battery pack connections, battery pack retention mechanisms, wires, cables, battery pack charger, circuitry, software, and algorithms;

i. By failing to ensure that all products and materials used to make the LifeVest and its component parts are properly identified during all stages of receipt, production, distribution, and installation so as to prevent mix-ups, or the use of adulterated products or materials

j. By failing to ensure that LifeVest devices conform to the design specifications approved by the FDA;

k. By failing to ensure that the environmental conditions surrounding the production, manufacture, handling, packaging, storage, transportation, and distribution of the LifeVest, its component parts, and the materials used to produce the LifeVest and its component parts are adequately controlled;

25

**COMPLAINT FOR DAMAGES**

l.  By failing to ensure that the health, cleanliness, personal practices, and
clothing of personnel having contact with the LifeVest, its component
parts, and the materials used to produce the LifeVest and its component
parts are adequately controlled;

m.  By failing to ensure that the equipment and materials used to produce
the LifeVest and its component parts are free from contamination and
substances that could reasonably be expected to adversely affect the
quality of the LifeVest or its component parts;

n.  By failing to ensure that all facilities used throughout the production,
manufacture, and distribution of the LifeVest, its component parts, and
the materials used to produce the LifeVest and its component parts are
suitable to ensure the quality and orderly handling of the LifeVest, its
component parts, and the materials used to produce the LifeVest and its
component parts;

o.  By failing to ensure that all materials used to produce the LifeVest and
its component parts are of sufficient quality, and will not adversely
affect the safety or effectiveness of the LifeVest;

p.  By failing to verify through measurement, testing, and inspection that
the LifeVest, its component parts, and the materials used to produce the

26
**COMPLAINT FOR DAMAGES**

LifeVest and its component parts conform to the design specifications

approved by the FDA;

q.  By failing to ensure that non-conforming LifeVest devices, non-

conforming component parts, and non-conforming materials are not

used in the production process and are not placed into the stream of

commerce;

r.  By failing to ensure that the LifeVest, its component parts, and the

materials used to produce the LifeVest and its component parts are

properly packaged and shipped so as to prevent against alteration,

damage, contamination, and deterioration;

s.  By failing to ensure that the LifeVest, its component parts, and the

materials used to produce the LifeVest and its component parts are

properly handled so as to prevent mix-ups, damage, deterioration,

contamination, or other adverse effects that could affect the safety and

effectiveness of the LifeVest;

t.  By failing to ensure that the LifeVest, its component parts, and the

materials used to produce the LifeVest and its component parts are

properly stored so as to prevent mix-ups, damage, deterioration,

contamination, use of obsolete, expired, or rejected items, or other

**COMPLAINT FOR DAMAGES**

adverse effects that could affect the safety and effectiveness of the LifeVest;

u.  By failing to ensure that only the LifeVest devices that have been approved for release and which comply with all design specifications and federal regulations are distributed into the stream of commerce;

v.  By failing to recall LifeVest devices that do not comply with design specifications, or are otherwise not safe or effective to be placed into the stream of commerce;

w.  By failing to ensure that expired, deteriorated, and unfit materials and components are not used to produce, manufacture, or distribute a LifeVest; and

x.  By failing to ensure that expired, deteriorated, and unfit LifeVest devices are not distributed into the stream of commerce.

64.    ZOLL's violation of the above federal regulations applying to the LifeVest's manufacture, production, and distribution caused the Subject LifeVest to be in a defectively manufactured and produced condition when it reached Mr. Lake;

65.    The Subject LifeVest's defective condition rendered the Subject LifeVest unsafe, and unreasonably dangerous for its designed, normal, and anticipated uses;

**COMPLAINT FOR DAMAGES**

66.    The Subject LifeVest's defective, unsafe, and unreasonably dangerous condition arose while the Subject LifeVest was in ZOLL's possession, custody, and control;

67.    The Subject LifeVest's defective, unsafe, and unreasonably dangerous condition actually and proximately caused injury, damage, and death to Mr. Lake;

68.    Worse, ZOLL was aware of the Subject LifeVest's defective, unsafe, and unreasonably dangerous condition at the time ZOLL caused the Subject LifeVest to be distributed to Mr. Lake;

69.    Pursuant to the FDA's premarket approval of the LifeVest, ZOLL was required to refurbish, repair, service, test, and inspect the Subject LifeVest's battery pack, battery pack connections, battery pack retention mechanisms, wires, cables, battery pack charger, circuitry, software, and algorithms in order to ensure the continuing functionality and safety of the Subject LifeVest;

70.    However, ZOLL failed to adequately refurbish, repair, service, test, and inspect the Subject LifeVest to be distributed to Mr. Lake in violation of the FDA's requirements for the device;

71.    Instead, ZOLL performed a perfunctory, truncated, and incomplete refurbishment of the Subject LifeVest so that ZOLL could place the Subject LifeVest back into the marketplace as quickly as possible in order to increase profits;

29
**COMPLAINT FOR DAMAGES**

72.    At all times material hereto, Mr. Lake was engaged to be married to Toni Barrett and was taking care of her son K.D.  as his own and providing at least 50% of the financial support and care to K.D.  who was under the age of 10 when it was discovered that Mr. Lake had passed away due to the malfunction of the LifeVest on March 27, 2023.

73.    By virtue of her status as Mr. Lake's wife—through applicable common law marriage within the jurisdiction of Austin, Texas, the Subject LifeVest's defective, unsafe, and unreasonably dangerous condition actually and proximately caused injury and damage to Mrs. Barret and her son K.D.  as well.

### IV.    <u>CONDITIONS PRECEDENT</u>

74.    All conditions precedent have been satisfied or excused.

### V.    <u>CLAIMS FOR RELIEF</u>

### COUNT I – STRICT LIABILITY

### (By DEBORAH VANCE as surviving mother of Solomon Lake; TONI BARRETT as fiancé and common law wife of Solomon Lake and K.D.  as a minor statutory dependent of Solomon Lake against ZOLL)

75.    Ms. Vance as the surviving mother of Solomon Lake, deceased, Ms. Barrett, and Mr. Dunkentell by and through his mother Ms. Barrett as guardian ad litem bring this Count I in their capacity.

**COMPLAINT FOR DAMAGES**

76.     Ms. Vance, Ms. Barrett and Mr. Dunkentell re-alleges and incorporates Paragraphs 1 through 74 of this Complaint for Damages as complained as if fully stated herein.

77.     ZOLL is responsible for designing, manufacturing, assembling, marketing, supplying, distributing, refurbishing, repairing, maintaining, and servicing the Subject LifeVest.

78.     The Subject LifeVest is defective in its manufacture, refurbishment, repair, production, assembly, and distribution.

79.     The Subject LifeVest's defective condition rendered the Subject LifeVest unsafe and unreasonably dangerous for its designed, normal, and anticipated uses.

80.     The Subject LifeVest's defective, unsafe, and unreasonably dangerous condition arose while the Subject LifeVest was in ZOLL's possession, custody, and control.

81.     The Subject LifeVest's defective, unsafe, and unreasonably dangerous condition actually and proximately caused injury, damage, and death to Mr. Lake.

**WHEREFORE**, Plaintiffs DEBORAH VANCE as the surviving mother of Solomon Lake, TONI BARRETT as the fiancé and common law wife of decedent Solomon Lake, and  K.D.  a minor who was dependent for at least 50% of his financial support from decedent Solomon Lake, whom he referred to as his father,

31

**COMPLAINT FOR DAMAGES**

demands judgment against each of the Defendants, ZOLL MEDICAL CORPORATION, ZOLL MANUFACTURING CORPORATION, ZOLL LIFECOR CORPORATION, ZOLL LIFEVEST HOLDINGS, LLC and ZOLL SERVICES LLC in a fair and reasonable amount to be determined by the jury and not to exceed $25,000,000.00 for all injuries and damages sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, and interest, and for any such further relief as the Court deems appropriate.

## COUNT II – NEGLIGENCE

### (By DEBORAH VANCE as surviving mother of Solomon Lake; TONI BARRETT as fiancé and common law wife of Solomon Lake and K.D. as a minor statutory dependent of Solomon Lake against ZOLL)

82.    Ms. Vance as the surviving mother of Solomon Lake, deceased, Ms. Barrett, and Mr. Dunkentell by and through his mother Ms. Barrett as guardian ad litem brings this Count II in their capacities on behalf of Solomon Lake, deceased.

83.    Ms. Vance re-alleges and incorporates Paragraphs 1 through 74 of this Complaint for Damages as if fully stated herein.

**COMPLAINT FOR DAMAGES**

84.    ZOLL is responsible for designing, manufacturing, assembling, marketing, supplying, distributing, refurbishing, repairing, maintaining, and servicing the Subject LifeVest.

85.    The Subject LifeVest is defective in its manufacture, refurbishment, repair, production, assembly, and its distribution.

86.    The Subject LifeVest's defective condition rendered the Subject LifeVest unsafe and unreasonably dangerous for its designed, normal, and anticipated uses.

87.    The Subject LifeVest's defective, unsafe, and unreasonably dangerous condition arose while the Subject LifeVest was in ZOLL's possession, custody, and control.

88.    ZOLL owed a duty to properly manufacture, produce, assemble, service, refurbish, repair, and distribute the Subject LifeVest so as not to be in a defective and unsafe condition when the Subject LifeVest reached Mr. Lake.

89.    ZOLL owed a duty to adequately test, inspect, and assure the quality of the Subject LifeVest before distributing the Subject LifeVest, or allowing the Subject LifeVest to be distributed to Mr. Lake.

90.    ZOLL breached the above duties.

91.    ZOLL's breaches of the above duties actually and proximately caused injury, damage, and death to Mr. Dunkentell.

33

**COMPLAINT FOR DAMAGES**

**WHEREFORE**, Plaintiffs DEBORAH VANCE as the surviving mother of Solomon Lake, TONI BARRETT as the fiancé and common law wife of decedent Solomon Lake, and K.D. a minor who was dependent for at least 50% of his financial support from decedent Solomon Lake, whom he referred to as his father, demands judgment against each of the Defendants, ZOLL MEDICAL CORPORATION, ZOLL MANUFACTURING CORPORATION, ZOLL LIFECOR CORPORATION, ZOLL LIFEVEST HOLDINGS, LLC and ZOLL SERVICES, LLC in a fair and reasonable amount to be determined by the jury and not to exceed $25,000,000.00 for all injuries and damages sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, and interest, and for any such further relief as the Court deems appropriate.

## COUNT III – LOSS OF CONSORTIUM

### (By TONI BARRETT, individually, against ZOLL)

92.     Ms. Barrett brings this Count III in her individual capacity to recover loss of consortium damages from ZOLL.

34
**COMPLAINT FOR DAMAGES**

93.    Ms. Barrett re-alleges and incorporates Paragraphs 1 through 74 of this Complaint for Damages as if fully stated herein.

94.    At all times material hereto, Ms. Barrett and Mr. Lake were engaged to be married around November 16, 2024 and had been living together for 14 years and acted as husband and wife within their community which pursuant to the laws of Texas—would be considered married by common law.

95.    ZOLL is legally responsible for Mr. Lake's wrongful death.

96.    Due to ZOLL's liability-producing misconduct that caused Mr. Lake's wrongful death, Ms. Barrett lost the companionship, fellowship, company, cooperation, aid, love, affection, comfort, emotional support, solace, and society entitled to her.

97.    Due to ZOLL's liability-producing misconduct that caused Mr. Lake's wrongful death, Ms. Barrett has suffered, and will continue to suffer, mental anguish and emotional distress.

98.    The aforementioned injuries and damages to Ms. Barrett were actually and proximately caused by ZOLL's wrongful and negligent acts and omissions.

**WHEREFORE**, Plaintiff TONI BARRETT, individually, demands judgment against each of the Defendants, ZOLL MEDICAL CORPORATION, ZOLL MANUFACTURING CORPORATION, ZOLL LIFECOR CORPORATION, ZOLL LIFEVEST HOLDINGS, LLC and ZOLL SERVICES, LLC, in a fair and reasonable

35

**COMPLAINT FOR DAMAGES**

amount to be determined by the jury, and not to exceed $20,000,000.00 for all injuries and damages to which she is entitled under California law, including interests and costs.

## VI.   DEMAND FOR JURY TRIAL

Plaintiffs DEBORAH VANCE as the surviving mother of Solomon Lake, TONI BARRETT as the fiancé and common law wife of decedent Solomon Lake, and K.D.  a minor who was dependent for at least 50% of his financial support from decedent Solomon Lake, whom he referred to as his father, hereby demand a trial by jury on all issues so triable.

Respectfully Submitted,

Dated:  March 21, 2025                        **THE VARTAZARIAN LAW FIRM**

                                              By: _____
                                                  Steve Vartazarian, Esq.
                                                  Justin Rabi, Esq.
                                                  Attorneys for Plaintiff,

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2025, I caused the attached documents to

be delivered via FedEx:

ZOLL MEDICAL CORPORATION

269 Mill Road,
Chelmsford, MA 01824-4105

ZOLL MANUFACTURING CORPORATION

121 Gamma Drive
Pittsburgh, PA 15238.

ZOLL LIFECOR CORPORATION

121 Gamma Drive
Pittsburgh PA 15238.

ZOLL LIFEVEST HOLDINGS, LLC

121 Gamma Drive
Pittsburgh PA 15238.

ZOLL SERVICES, LLC

269 Mill Road
Chelmsford, MA 01824-4105

Dated:  March 21 , 2025                THE VARTAZARIAN LAW FIRM

                                        By: _____

                                            Steve Vartazarian, Esq.
                                            Justin Rabi, Esq.
                                            Attorneys for Plaintiff,

**COMPLAINT FOR DAMAGES**